Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to give their attention to the court is now sitting. God save the United States and this honorable court. Good morning. Good morning. Good morning. I want to welcome everyone to the Fourth Circuit Court of Appeals this morning. I'm sorry we're not in Richmond. In the beautiful Lewis Powell Courthouse, but we'll do the best we can under the circumstances. Our first case. Well, first of all, in addition, I want to judge Diaz and I are honored to have Judge Gallagher with us this morning from the District of Maryland sitting on the Fourth Circuit Court of Appeals. Welcome, Judge Gallagher. Thank you. Our first case this morning is number 19, 1962, August Mack Environmental versus the Environmental Protection Agency. Mr. Zimmerle. Good to have you with us, sir. Thank you, Judge. Good morning. I may have pleased the court. My name is still Zimmerle. I'm the counsel for the appellant, August Mack Environmental Incorporated. In this appeal, August Mack seeks reimbursement for substantial remediation work that it performed at a Superfund site in Fairmont, West Virginia. The district court found that because August Mack did not submit a preauthorization form prior to performing the work, August Mack may not recover from the Superfund. This court should reverse the district court's decision for three reasons. First, the EPA's reliance on the preauthorization form violates the Paperwork Reduction Act. Rejecting August Mack's application for reimbursement for failing to submit a preauthorization form is an unlawful penalty. Second, the district court's application of a strict compliance standard is arbitrary and capricious because it relies upon an obsolete form and ignores a primary aim of CERCLA. August Mack sufficiently alleged that it had substantially complied with EPA's preauthorization regulations and should have been allowed to pursue its claim. Third, the district court erred in its analysis of the site-specific funds that were available under the consent decree. Turning to the first point, the EPA's reliance on the preauthorization form violates the Paperwork Reduction Act. The PRA was designed to reduce and minimize... Mr. Zimily, I'm sorry, this is Judge Diaz. I have a question, sort of a factual question, I guess. In a... Had this project gone as your client had anticipated and Verteles had not filed for bankruptcy, can you explain to me how you would have envisioned your client being paid under the structure and contracts that were in place at the time? I mean, you wouldn't have relied, I wouldn't think, on the Superfund to get payment, would you? But for the bankruptcy of the general contractor? That's correct, Your Honor. I believe that that was... The original intent was to... Verteles would have paid, but for their bankruptcy. And after they declared the bankruptcy, at that point in time, the funds were sought from the Superfund. And where would Verteles have received payment from? In what part of money? I believe that Verteles would have paid August MAC directly, not from any fund that was created either on the Superfund or the special site funds. Okay, so this is sort of what you're trying to... Here is essentially a... And I don't blame you for this, but trying to look at alternative pots of money to make your client whole. But I guess you can see that in the normal course of business, Verteles would have paid your client, I guess, from their own accounts. But can you explain to me why your client, it appears, never sought payment throughout the time that it was doing work over the... I guess many months that it was doing work without seeking some sort of progress payments? I don't know, Your Honor, as to why. I don't know the facts as to that, other than what's been alleged is that they had assurances that they would be paid. And it was only after Verteles declared bankruptcy and those funds weren't available from Verteles that they sought them from the Superfund and from the site-specific funds. Okay. This is Judge King. Did you all... This started in 2012? That's right, Your Honor. Bankruptcy was like five years later. Did you all do work over the five-year period leading up to that? Your Honor, yes, there was work performed from 2012 to 2016. Trying to clean up that mess there, fair amount. Exactly, Your Honor. And you didn't get paid along the way from anything? It's my understanding that there may have been payment for portions of the work that were done before Verteles. But at the end, ultimately, there was an outstanding balance of around $2.7 million. I understand. So that's one clarification. You're suing for an outstanding balance. How much had you been paid along the way? I don't know that fact off the top of my head, Your Honor, but I could look for it and provide it to you in reply. Is any of this information that Judge Diaz and I have been asking about in the record in this case? I'm not aware, Your Honor, but I can double-check that on the record. Is there no administrative record that was created by the EPA in connection with this claim? Usually, when we have an agency decision and there's an agency appeal, the agency is obliged to file the administrative record. And that's what comes up on the agency appeal. And then we resolve the matter on it. And I can't find any information in there. Now, you all, both sides, talk about facts that indicate that you may advise the EPA of what you're going to do. And they approved it along the way. And the EPA has been set up, Lee, in their brief. They revised and they approved, but you didn't file this form that you say has expired in 1994. What's the difference between approval and authorization? Do you look it up in the dictionary anywhere? I don't know that there's much of a difference in terms of the definition of approval and authorization, Your Honor. To us, it's a distinction without a difference. And I think that the court's point with regard to there not really being a record developed in the underlying case really highlights the fact that this case arrives to the court from a 12B6 perspective. And all facts alleged by August... How did you get into a 12B6 perspective when you got an appeal from an agency? I know that you have here... You filed papers with the EPA, and they put a three-judge panel together, just like we have today. They put a three-judge administrative law panel together, and that panel threw your case out. And then you filed a notice of appeal in the district court for Northern West Virginia, right? Yes, Your Honor. I don't know that it was a three-judge panel in front of the... I believe it was just an administrative law judge, but yes. I thought I read something about a three-judge panel. All right, administrative law judge. Administrative law judge made a decision, and you filed a notice of appeal. And then for some reason, there was a complaint filed, and then an amended complaint, and then a second amended complaint. And then a Rule 12B6. It's almost like things got mixed up. You came up on an administrative appeal, and then it got into a regular complaint, the Rule 12B6, and it was disposed of, just as you said, as a dismissal under Rule 12B6. I'm sort of confused about the procedure, and nobody explains that. Either side, as far as I can tell, explains it in the brief. Maybe you all can explain it here. Of course, the EPA lawyer is listening in, and he's going to get a good chance to figure it all out here before we get around to it. But go right ahead. Well, Your Honor, and with regard to that point, in terms of what was decided in front of the ALJ at the EPA administrative level, it was also decided on a 12B6 motion in terms of its equivalence. So ultimately, our request for relief in this case is the case be remanded back to the ALJ and the EPA to determine the case on the merits, as opposed to deciding on it on a 12B6 motion, which had to do with the form that was expired and obsolete and a violation of the Paperwork Reduction Act. Specifically, with regard to the Paperwork Reduction Act in 44 U.S.C. section 3507, the PRA states that an agency shall not conduct or sponsor the collection of information unless the agency has, among other things, submitted to the director the proposed collection of information and published a notice in the Federal Register. Additionally, the director has to approve the proposed collection of information, and the agency has to obtain from the director a control number to be displayed upon the collection of information. Importantly, that approval is not perpetual. This is Beth Gallagher. Can I interrupt with a question? So you're looking to remand to the EPA and ALJ to have discovery there, because you mentioned that you're looking for discovery. My question was, where would the discovery take place, and what discovery are you trying to obtain? Well, in terms of the discovery that we believe would be important in this case, it would be with regard to the work that was performed. It would be providing information to show the work that was performed in getting the cost approvals. It would also be looking at the preauthorization work that was ordinarily required by the EPA. The EPA indicated in this case that they require it, but we believe that that sort of information is not ordinarily required by the EPA. Importantly, the approval under the Paperwork Reduction Act is not perpetual. Instead, the OMB director may not approve a collection of information for a period in excess of three years. This is before USC section 3507 subsection G. So the EPA is required to seek renewal every three years for a form or collection of information. And the EPA preauthorization regulations are directly subject to the PRA. In fact, when the proposed rule for the preauthorization regulations were published in the Federal Register in September of 1989, a specific section was devoted to the Paperwork Reduction Act. However, the last time the OMB declared the form 2075-3 through OMB number 2050-106 was on June 4th, 1998. And that clearance expired on April 30th of 2001. Now, the EPA in its response brief has not identified any evidence or legal support to show that it renewed OMB number 2050-106 after it expired in 2001. With regard to this argument regarding the Paperwork Reduction Act and the necessity for a form, there's no dispute, is there, that the statute certainly requires preauthorization in some form. You know, whether or not this form was the appropriate way in which to do it, I think the statute is pretty clear that it requires preauthorization. There's nothing in the record, as best I can tell, that your client made any effort to seek a form without preauthorization beforehand. It's now sort of making an argument after the fact, given the lack of payment that we talked about earlier from the primary source. So why wouldn't it have been incumbent upon your client to seek advice, a recommendation, or some input from the EPA as to how to comply with that statute, irrespective of the fact that the paperwork, that the particular form may have expired? Well, great question, Your Honor. And I would draw the Court's attention to the statute itself, 42 U.S.C. Section 9611. There is no, in the statute itself, there is nothing in the statute that requires that authorization be provided prior to doing the work. There's nothing in the statute that speaks about preauthorization. Instead, the statute itself states that such costs must be approved under said plan and certified by the responsible federal official. So the statute itself doesn't require preauthorization. It's the regulation that requires preauthorization. And our position in this case is that ultimately it was impossible for them to strictly comply with getting preauthorization per the form because the first step in that process was submitting a form that was expired and obsolete. And so they were unable... Okay, so let's, so thank you for making that distinction. So the regulation imposed an additional requirement or a supplementary requirement beyond the text of the statute. So even in that context, why wouldn't it have been the proper response to have reached out to the EPA or some government official and say, hey, you know, we've got this regulation and we're attempting to comply with it. There's a form that's outdated. What do we do? Well, as I think, Your Honor, as you pointed out at the outset, originally the intent was not to seek it from the Superfund. After Vertelis went bankrupt, then at that point in time, authorization was sought from the Superfund. So there was not an original intent to seek it from the Superfund. However, there was substantial compliance at the same time because every single piece of work that was done by August Mack as alleged in the complaint was provided to the EPA and the EPA supervised and authorized that work before it was done. So in terms of a substantial compliance standard, which is what we're advocating in this case, that information was provided to the EPA and would draw the court's attention to the four purposes of the authorization. You said it was authorized by the EPA before it was done, the work. And they're arguing that you didn't get it authorized by using this form. Is that the whole lawsuit here? I think so, Your Honor. They had to use this form. You had to use this form rather than an approval other than the form. That's right, Your Honor. And both sides agree that the work was approved before it was done by EPA. Yes. That's right, Your Honor. Is that clear from the record? I believe that it's clear from the record, Your Honor. And for purposes of this being a case that's on a 12B6, what we've alleged in paragraph 10 of our complaint is that the work was supervised and it was authorized by the EPA. Do you use the term authorized or approved? I believe we use the word authorized, Your Honor. Okay. We have to accept that as true if the civil rules apply. Yes, Your Honor. This is Judge Gallagher. Sorry, I'm looking at paragraph 10 and then it says, EPA specifically approved AME as the supervising contractor and supervised all of the work AME performed and all of the costs AME incurred. Is there a difference between supervising the costs AME incurred and preauthorizing those costs? It's unclear to me whether the process involved a real evaluation of the costs or was more focused on the work that was going to be done for cleanup. Well, Your Honor, I think with regard to that allegation, it's such that all reasonable inferences must be taken in favor of August Mack. And so that would include both supervision and approval for that work. But you aren't saying that you want your 2.6 million or whatever it is to the penny now. You just want us to send it back and they can contest the exact amount, right? That's exactly right, Your Honor. Under your position. I'm summing up your position. I think trying to advance things along here because you're getting down close to running out of time. Yes, Your Honor. And that is ultimately the request that we're seeking here is a ruling as to the merits because ultimately the work that was performed by August Mack on the site met all the requirements in terms of it being necessary and in fact the EPA is relying upon the work that was done by August Mack. And so ultimately what we're asking for in remand is that that work be assessed on its merits as opposed to its failure to provide this preauthorization form prior to doing the work. And ultimately with regard to the penalty provision in the Paperwork Reduction Act it states that no person shall be subject to any penalty for failing to provide with a collection of information. And that includes not only the imposition of a fine or other punishment it also includes the denial of a license, privilege, right, grant, or benefit. And the plain meaning of denial is where there's a refusal or rejection such as for a request or a petition and a benefit, certainly the benefit here to August Mack would be that $2.6 million that they sought in terms of the work that they had done and that was not compensated. And so I see that I'm out of time, Your Honor. We respectfully request that this case that the district court decision be reversed and that this case be remanded back to the EPA to allow for a merits-based ruling by the EPA. Thank you. Well, we really couldn't remand it to the EPA because we'd have to remand it to the district court and you'd have to remand it to the district court to send it to the EPA. There'd be another step in there, I think. But we understand what you're trying to get. Yes, thank you, Your Honor. It's not preserved as well. Yes, thank you. Very good, thank you. Now, Ms. Shugart-Schmidt, you're here for the Environmental Protection Agency? That's correct, Your Honor. Good to have you with us. And you go right ahead. Thank you. Good morning, Your Honors, and may it please the court. Caitlin Shugart-Schmidt on behalf of the Environmental Protection Agency. At the outset, I'd like to note that the core of today's dispute is that Vertelis failed to pay its bills on a private contract. And while Vertelis' insolvency is deeply unfortunate for both August-MAC and for the Environmental Protection Agency, August-MAC's recourse was in bankruptcy proceedings. The fact that that process was unable to make August-MAC whole does not mean that the federal taxpayer now can or should pay the bill. The district court correctly held that AME did not comply with a clear preauthorization requirement and is thus ineligible for reimbursement from the Keeper Fund. Further, the consent decree itself makes clear that AME is not entitled to payment from funds allocated under it. Because the district court properly rejected AME's claims, we ask this court to affirm. And at the outset, I'd just like to respond. Ms. Shugart-Schmidt, as you mentioned, you started your argument off by saying that it would be inappropriate and inequitable for the taxpayer to foot the bill. What troubles me about this case and maybe the record is deficient in the sense that there's no clear answer is that wouldn't it also be inequitable and unfair and unjust for the government to reap a windfall at the expense of a contractor who did work for the government, whether directly or, in this case, indirectly, and was not paid? I mean, I can see if the government actually paid Vertelis and Vertelis, for whatever reason, didn't pay the contractor. Maybe that's what happened here, but the record just isn't clear. So if it's the case that this contractor did work for the federal government, did work for the public, cleaned up the mess at this site, and ultimately was not paid because the government didn't pay Vertelis, that seems to be unfair and inequitable to me. So maybe you can talk about that to the extent that the record provides an answer. Of course, Your Honor. I think that that's a great question because it highlights where the relationship here actually exists. Vertelis and a private business that it contracted with, August Mack. The relationship wasn't with the federal government and August Mack. And that's important because the purpose... I thought you agreed, this is Judge King, I thought you all agreed in your brief that you did know what they were doing along the way for five years or four or five years there and that you all approved the work along the way. Yes, Your Honor, that's an important clarification. That's accurate, is it not? And that's what's alleged in the complaint as well. But you agree with that in your brief. In part, Your Honor. EPA approved the work that this outfit did along the way and I guess Vertelis paid them along the way to a certain extent, but they're suing basically or trying to recover the balance due. That's right. Under the consent decree. In law school they talked about quantum merit or something. If you do some work, you're entitled to get paid for it by somebody and otherwise there's a windfall to somebody. So here the EPA reached a windfall and of course the citizens of West Virginia, particularly Fairmont, reached a windfall because you do get this place cleaned up and it was a mess and it was poisoned and it should have been cleaned up. But the tip out it did the work. It's worth something. Maybe it's not worth 2.6 million. Maybe it's worth 1.6 million, but somebody ought to be paying for it. It seems to me as a matter of equity and you're the one brought up equity. Well, Your Honor, the issue here is that both August Mack and the EPA were ultimately put in a really bad position by Vertelis' decision to go bankrupt because Vertelis is the polluting party. They're the responsibility for the cleanup. We know that Vertelis went bankrupt and that's what precipitated this suit. But is it true that the agency has the discretion to compensate this outfit, August Mack, from the Superfund? No, Your Honor, it does not because August Mack did not comply with the regulatory requirement of preauthorization. And if a party does not comply... You're talking about from a legal standpoint. I'm asking you, does the EPA have the discretion, the agency have the discretion to compensate August Mack for work performed on this site? Under the regulations? No, it does not. It does not have that discretion because it only has discretion to compensate parties if they've received preauthorization to get reimbursement from the Superfund or if the consent... And you argue that they have to strictly comply with the use of this form which is outdated. That would be... If we agree with them that they couldn't comply with that, use that form because it's outdated, it would be impossible to comply and you fall back to whether they use a strict compliance or a substantial compliance doctrine that they might be able to fall back on. You don't believe in a substantial compliance doctrine. Correct? Well, under the Paperwork Reduction Act, Your Honor, if a form is outdated, then a party is not obligated to use that form. But what the PRA specifically provides is that the agency has to allow a party to then prove or satisfy the relevant legal condition in any other reasonable manner. So the function of the PRA is in the manner of an affirmative defense. If the EPA sought to impose a fine or some sort of criminal penalty on AME, then AME in those enforcement proceedings could say, ah, but you requested this information on an invalid form and thus you can't move forward with those enforcement proceedings. But here, when EPA, sorry, when August Mac is affirmatively seeking something from the government, what the PRA says is if the form is invalid, then AME is entitled to comply with the requirement in any other reasonable way. But it still has to comply with the requirement. And the requirement here is to seek pre-authorization. And that's what the clear definition under... Now, they say that they did comply and substantially comply because they presented their proposals to you all before the work was done and EPA approved the work. And I thought both sides agreed to that and certainly the complaint alleges that. Your Honor, let me clarify if I may. This is hard for me to understand. Of course. You have to find some way to comply and you admit that they did comply. We don't admit that they did comply because they didn't. And if I can take a moment to just clarify that. You say in your brief that you approved the work before it was done. It is correct that... We have to take the facts of the complaint as true. It is correct that as AME was doing work on Vrtelis' behalf pursuant to the consent decree, it submitted that work to EPA to show that Vrtelis was complying with the requirements of the consent decree. Nobody disputes that. Well, the work was done on the public's behalf as well. Right. But under the CERCLA document, the parties... And you represent the public interest. The EPA represents the public interest. It was in the public interest of the people of West Virginia and the United States to get this place cleaned up. And I don't know whether it's cleaned up fully yet, but it's cleaned up some. It's actually not cleaned up fully and to the degree that EPA now bears the burden because of Vrtelis' bankruptcy of cleaning up, EPA expects to not only exhaust the remaining funding available for cleanup of the site, but to have significant liabilities beyond the funding still left in the site-specific fund. So when there's discussion here of the equities and Augustmat being left sort of holding the bag, the problem is that EPA has also been left in a very difficult position of being responsible now for not only conducting the vast bulk of the site cleanup work,  all of that work. And so we're in a situation now where the polluting party, the party that's responsible for the cleanup of the site is actually the polluting party has essentially flipped away and not paid its bills to its private business that it contracted with. And if I can just clarify on the approval versus preauthorization thing, the crucial thing that's absent here from AME's discussion of getting preapproved or submitting information to EPA is that a crucial aspect of the preauthorization process is that EPA has a chance to evaluate costs. It can evaluate whether or not a project is not just a high enough priority to be worth Superfund dollars at that particular moment because there are so many sites and so many limited funds, but also to evaluate whether or not that the project is going to spend the right amount of money, whether or not there's going to be financial oversight procedures in place, what the timeline is. And AME even admits in its reply brief at page four that it stands ready to submit cost information to EPA, which makes very clear that at the outset, AME was not providing that information to EPA before it was undertaking any response action, which is a crucial aspect of the preauthorization process. It's not just that it's going to do X amount of work. It's that it's going to do X amount of work. It's going to cost Y amount, and this is how we're going to make sure that the money is spent appropriately. And that's really important because EPA has so many competing demands on the Superfund and on its workforce and availability to do site cleanup. So if these preauthorizations aren't conducted in advance, then not only can EPA not decide between these varying projects as important, but it also then can't assure private parties that funding will be available to pay them when they do work on EPA's behalf. So for both those reasons, it's incredibly important that this preauthorization occur before work begins so that everybody is on the same page about what work will be done, how much it will cost, and who will get paid for it.  I'm sorry. Go ahead. Oh, I was just going to follow up on that. Don't we not have a particularly clear record in terms of what information is available and what information was or was not provided by AME to the agency at this point? Perhaps because there was no discovery, but the fact that we're trying to glean meaning from references and briefs rather than having it in the record seems to indicate that we don't have a very clear record about what the EPA might have had. You're right. I would say that AME doesn't even assert that it provided this information to EPA in its complaint or later in its briefing, but also that even if there was some discovery that showed that there was some cost information provided or there was certain other approvals that were made, that wouldn't change the fundamental fact that August MEC did not even attempt to get preauthorization for its claims because it was never intending to be paid by EPA. It had made a private contract with this polluting party, Vertelis, to do certain work for Vertelis. So there simply wouldn't be anything revealed in discovery that could change that basic fact. And I'd also like to take a moment here, if I can, to focus on the fact that when August MEC is making this argument that it substantially complied with the preauthorization requirement, it's not pointing to anything in the actual language of the regulation, the language of the statute, or in the case law or other court doctrines that would allow this sort of substantial compliance doctrine to apply to this otherwise bright-line rule. And the regulations clearly state that a claim must be preauthorized even if there's some flaw in the application process that's later delineated that wouldn't change this baseline feature that claims must be approved before they're authorized for reimbursement. Well, I thought that you, again, that you agree they were approved. Do you think there's some material difference between your approval     is because if you look at the regulations in 307.22 and 307.23, you'll see that there's some difference between the material difference between the material difference in 307.23, it talks about the sort of broad swath of data and information that's required in order to preauthorize the claim and that process means that an application has to be submitted in advance. EPA has to have an opportunity to review that application, to analyze it, to compare it with other priorities and then EPA releases what's called the Preauthorization Decision document and that document clearly articulates for the benefit of all parties what particular work is authorized and then what the actual reimbursement will end up being and far be it from AME's assertion that this process isn't used but you can see in the record here, I think it's on page 283 of the Joint Appendix, a clear example of one of those Preauthorization Decision documents that clearly references that an application was submitted, EPA reviewed that application pursuant to the regulations and it set forth all of the criteria for that party to seek reimbursement and we've provided additional examples in our brief. Yes, this process is used infrequently but it should be used infrequently because the point of it is to supplement times when polluting parties cannot be found to finance their own site cleanup. Otherwise, we shouldn't be using the Superfund as some sort of super insurer to make up for when polluting parties don't pay their own bills. That's not the function of the Superfund. It's to clean up hazardous waste contamination when there's no other possible way of doing it. And that's why the regulations were written the way that they were. And Anne, I'll just make this. Yes, sorry. If Vertellus had not filed for bankruptcy in this case, can you describe to me from EPA's perspective how a contractor    this was a private contract and they would have looked directly to Vertellus but there was no other way that they could have paid for bankruptcy in this case. There's also information in the record that suggests that if Vertellus failed to complete the work, then EPA would be authorized to then take over the work and use whatever remaining funds were available from this cleanup fund that was created to cover the cost. And wouldn't that include the cost that a contractor like August Mack or the work that it would have done on this site? So openly wouldn't it not clearly from the record exactly what happened, but wouldn't EPA have then been obligated to pay August Mack from the funds that were provided by the other pollutant defendants in this case? No, Your Honor. And the reason for that, first of all, is that the consent decree and the way that this was set up never contemplated using any money from the super fund. The obligation was that Fertelis was the performing defendant and it was responsible for completing the cleanup work and it was responsible on its own for paying contractors to complete that cleanup work if it didn't want to do it in-house. That's the penalty you get for being a polluting party. The consent decree site-specific funding is a little bit trickier because the way that that functioned was essentially an insurance policy for EPA if Fertelis did something like bankrupt or just threw up his hands and said, well, we don't want to work on this anymore, we're not going to fulfill our obligations, EPA has to step in and take over those responsibilities on its own. That money exists within the consent decree site-specific fund to ensure there's some ability for EPA to continue that work. As I mentioned before, EPA expects the liabilities of the site to exceed and likely in the future greatly exceed that pot of money that's available. And this is not related to the secret fund claim. So that responsibility would not have included paying those contractors who had done work but had not been paid? No, Your Honor, and that's because the recourse for a private party that's made a contract with a party that's then gone bankrupt is a claim in bankruptcy court. It's up to the bankruptcy court to evaluate all of the outstanding liabilities and determine where the money that was remaining was appropriately returned. And it's certainly unfortunate that either EPA or A&E was able to be made whole by those bankruptcy proceedings in terms of its obligations and outstanding financial responsibilities. But that was the recourse that August Mack had when Vartalos chose to go bankrupt. Let me take you back to the question I asked at the very beginning of your argument. I think you may have answered it at least indirectly, but I want a direct answer from you. Do you think that the public and the   have the responsibility to get work done? And if not, can you explain why? No, Your Honor, because there was a company here that had contracted to have work done. That work was Vartalos's responsibility to get done. Instead of doing it in house, it paid another company's responsibility to get done. And that company was the company that was responsible for  the work. And Vartalos was responsible for all the work. And Vartalos was responsible for all the work.   was        He was responsible for all the work. And that was Vartalos's responsibility. And that was his responsibility. And   responsible for all the work. was his responsibility. And he was responsible for all the work. And that was Vartalos's responsibility. And he was responsible for all     was Vartalos's responsibility. And he was responsible for all the work. And that was Vartalos's responsibility. And I will be very grateful   of Vartalos's  And   be very grateful for all of Vartalos's work. And I will be very grateful for
judges: Robert B. King, Albert Diaz, Stephanie A. Gallagher